UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

ANGELO RUOTOLO,

                    Plaintiff,

     -against-                             1:22-CV-0169 (LEK/DJS)

TOWN OF NEW PALTZ, *et al.*,

                   Defendants.

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

Pro se Plaintiff Angelo Ruotolo commenced this civil rights action on November 15, 2021, in the United States District Court for the Southern District of New York. Dkt. No. 1. Two months later, Plaintiff filed an amended complaint. Dkt. No. 39 ("Complaint"). After Ulster County, Juan Figueroa, and John Doe (collectively, the "Ulster County Defendants") answered the Complaint, Dkt. No. 47, the Honorable Cathy Seibel, United States District Judge, transferred the action to this Court, and ordered the remaining Defendants—James Bacon, Kevin Barry, Neil Bettex, Stacy Delarede, Mark Jaffee, and the Town of New Paltz (collectively, the "New Paltz Defendants")—to answer the Complaint by March 15, 2022. Dkt. No. 52; see also Dkt. Entry dated Feb. 23, 2022. Now before the Court is the New Paltz Defendants' Motion to Dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. No. 56 ("Motion"). For the reasons that follow, the Courts grants the Motion in its entirety.

## II.    BACKGROUND

### A.  Plaintiff's Factual Allegations

The following factual allegations are set forth in Plaintiff's Complaint, and his attached exhibits, Dkt. Nos. 39-1–3, which the Court accepts as true for the purpose of deciding the

Motion. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (recognizing the "tenet that a court must accept as true all of the [factual] allegations contained in a complaint" when ruling on a motion to dismiss for failure to state a claim); see also Kramer v. Time Warner Inc., 937 F.2d 767, 773 (2d Cir. 1991) ("In considering a motion to dismiss for failure to state a claim . . . a district court must limit itself to facts stated in the complaint or *in documents attached to the complaint as exhibits*" (emphasis added)).

In December 2012, Plaintiff purchased a home located at 139 State Route 208 in New Paltz, New York ("139 Property") for use as a rental property. Compl. at 24.[1] About four months later, in April 2013, Plaintiff purchased the property next door at 137 State Route 208 ("137 Property") for the same purpose. Id.

In September 2015, Mark Jaffee, "a newly hired building inspector" for the Town of New Paltz, "left [Plaintiff] a message on voice mail to inform [him] that" the 139 Property was in violation of the New Paltz Town Code "due to an alleged illegal apartment downstairs . . . ." Id. Jaffee "asked [Plaintiff] to call him [back] in order to avoid court proceedings." Id. Plaintiff "immediately" returned Jaffee's call. Id. "[S]ubsequent conversation with . . . Jaffee revealed [to Plaintiff] that the building code violations were based on an inspection that [Jaffee's] supervisor, Stacy Delarede[,] had conducted on or about April 4, 2015," at the 139 Property. Id. at 24–25. "Based on [further] conversation with . . . Jaffee," Plaintiff learned that "no additional inspections were ever conducted . . . by [Jaffee], nor [by] his supervisor . . . Delarede at the 137 [Property], but violations were nevertheless issued for both" the 137 Property and the 139 Property (collectively, the "Properties"). Id. at 25.

---

[1] For the avoidance of doubt, the Court uses the page numbers generated by CM/ECF—the Court's electronic filing system—when referring to specific pages in Plaintiff's Complaint, his attached exhibits, and all other court filings in this case, including Defendants' papers.

In October 2015, "[c]riminal [c]ourt [p]roceedings were filed against . . . Plaintiff[]" for the alleged violations on the Properties, "irrespective of the [fact that] the violations being issued [were] based on . . . hearsay . . . and no inspections . . . [were ever] conducted" at the 137 Property. Id. at 25. According to a marked-up transcript of a judicial proceeding held before the Honorable James Bacon of the New Paltz Town Justice Court on February 9, 2016—which Plaintiff provided in the exhibits attached to his Complaint—the Town of New Paltz alleged that both Properties had an "illegal accessory apartment," and were illegally converted from two-family dwellings to single-family dwellings by adding unapproved fifth bedrooms. Dkt. No. 39-3 at 113–14.

During this court proceeding, Jaffee and Plaintiff reached an agreement to adjourn the matter to later "in the spring." Id. at 115. According to the Complaint, the agreement required Plaintiff to "hire an engineering firm in order to get Ulster County Board of Health Approval for the two [P]roperties to be used as they were being used at that time, namely housing 7 students at the 139 [Property] and housing 6 students at the 137 [Property]." Compl. at 25–26. Specifically, "if the Ulster County Board of Health was in agreement and the well water capacity and the [s]eptic capacity was adequate and Ulster County Department of Health was OK with that, so was [Jaffee]." Id. at 26. In addition, Jaffee "provided to [Plaintiff] the name of an engineer whom [Jaffee] recommended in open court and on the record." Id. at 26 (citing Dkt. No. 39-3 at 114). Plaintiff, however, found this recommendation "highly unethical and dubious," and was surprised that the recommendation "did not . . . appear to . . . concern . . . Judge . . . Bacon . . . ." Compl. at 26.

Plaintiff "compl[ied] to the fullest letter of the agreement reached with . . . Jaffee, with the exception that [Plaintiff] did not hire the engineer suggested by [Jaffee] . . . but rather . . . a

different engineering firm . . . out of Latham, New York." Id. In addition to hiring an engineer, Plaintiff "install[ed] dual flush toilets," "low flow shower heads," and "water meters"—all at Jaffee's direction. Id. at 27. This caused Plaintiff to incur "substantial expenses . . . ." Id.

"Following site evaluations, inspections[,] and [a] report to the Ulster County Board of [H]ealth by . . . [an] engineer" from the firm Plaintiff hired, the firm filed an application "with the Ulster County Board of Health . . . to continue to use the [P]roperties as they were being used . . . ." Id. After submission, the application "was approved." Id. (citing Dkt. No. 39-3 at 125 ("The UCDOH concurs with the conclusions and recommendations stated in the [submitted report] regarding the septic systems on the subject properties.")). In the Complaint, Plaintiff emphasizes that the "report prominently lists on page 1 that the properties are being used to house 7 students in the 139 [Property] and 6 students in the 137 [Property]." Compl. at 27. "Jaffee was informed of and provided with a copy of the Ulster County Board of Health Approval." Id. at 28. "**AT NO TIME DID . . . JAFFEE SAY OR COMMUNICATE WITH** [Plaintiff] **THAT STUDENT HOUSING WAS A USE NOT ALLOWED.**" Id. (emphasis in original).

"[P]laintiff then asked . . . Jaffee . . . what were the next steps that needed to be complied with in order to finalize the matter." Id. "Jaffee instructed . . . [P]laintiff to file a permit application for each [P]roperty; render to the best of [Plaintiff's] ability a plan drawing showing what the lower area looked like in both [Properties]; and submit the application, fee, and drawing to the New Paltz Building Department." Id. Plaintiff "complied to the fullest letter of [Jaffee's] instructions[,] and on [each] application, . . . [P]laintiff prominently listed . . . that each [P]roperty **was being used as 100% student housing** . . . ." Id. at 28–29 (emphasis in original). Ultimately, in June 2016, the "[c]riminal [p]roceedings were withdrawn, and . . . Jaffee

inform[ed] . . . [P]laintiff in an [e-]mail that [Plaintiff] no longer has to report to court in connection with these criminal proceedings." Id. at 29.

In May 2016, Plaintiff transferred the Properties into two separate limited liability companies ("LLCs"). Id. Plaintiff "continue[d] in a management capacity for each LLC." Id. Specifically, Plaintiff transferred the 137 Property into "137 State Route 208, LLC," and the 139 Property into "139 State Route, LLC." Id.

In October 2018, "[n]ew criminal court appearance tickets were issued and additional criminal proceedings were brought against each respective LLC and its management agent for a building code violation under a fictitious name . . . ." Id.; see also Dkt. No. 39-3 at 292 (compelling "Anthony Ruotolo" to appear in court on behalf of "137 Route 208, LLC," as opposed to Angelo Ruotolo, Plaintiff's name). "[T]his time[,] the criminal proceedings were for **Single Family House used as student housing, use not allowed.**" Compl. at 29 (emphasis in original). "At no time prior to these latest criminal proceedings[] was there any mention by . . . Jaffee, nor anyone else at the building department, that student housing was not being allowed," despite the fact that Plaintiff's prior applications "prominently disclosed that these properties were being used as 100% student housing." Id. at 29–30.

Prior to his arraignment on April 23, 2019, Plaintiff "wrote to the court a letter dated April 2, 2019, . . . and informed the court that this matter had been the subject of previous criminal court proceedings and was settled to the fullest satisfaction of the Building Inspector . . . Jaffee in 2016." Id. at 31–32. Plaintiff "also informed the court" of several other problems with these new criminal proceedings, including that "the appearance ticket contained the wrong name, Anthony Ruotolo, a name that [Plaintiff] ha[s] never used or been known by . . . ." Id. at 32. Plaintiff also informed the New Paltz Town Justice Court that "res judicata and collateral

estoppel[,] based on the agreement reached with . . . Jaffee in 2016," prohibit the initiation of these new criminal proceedings. Id. Plaintiff also pointed out that he "had not been supplied with a supporting deposition, which is a requirement pursuant to criminal proceedings that are initiated with [a] [c]riminal [c]ourt [a]ppearance [t]icket." Id. Based on these "numerous defects," Plaintiff "asked the court to dismiss the proceedings . . . ." Id.

Plaintiff appeared at his arraignment hearing without an attorney on April 23, 2019, in the New Paltz Town Justice Court, for the violations Jaffee reported in October 2018. Id. at 31; see also Dkt. No. 39-3 at 3–6. Attorney Kevin Barry "appear[ed] on behalf of the Town of New Paltz." Dkt. No. 39-3 at 4. According to a marked-up transcript of the hearing provided by Plaintiff, Judge Bacon "enter[ed] a plea of not guilty on [Plaintiff's] behalf." Dkt. No. 39-3 at 4. Judge Bacon also "advise[d] that [Plaintiff] either get an attorney or speak to [the building inspectors] about a resolution," noting that if Plaintiff proceeded without an attorney, he would be "at a distinct disadvantage." Id. at 4–5. Judge Bacon also referenced the letter Plaintiff submitted to the court, and Attorney Barry responded that Plaintiff's letter was not "a formal motion, so [he would] respond by letter." Id. at 4. Judge Bacon then scheduled a pretrial conference for May 28, 2019, and adjourned the hearing. Id. at 5.

Plaintiff appeared again without an attorney at the pretrial conference held on May 28, 2019. Id. at 74–84. During this conference, Plaintiff's request for a jury trial was granted. Id. at 78. Judge Bacon also ruled that "[o]pen file discovery [was to be] completed with[in] two weeks." Id. at 81. However, the court "refused to grant the dismissal" requested by Plaintiff in his earlier letter, and "refused to order [that] a supporting deposition be[] provided to [Plaintiff] . . . ." Compl. at 32–33. In September 2019, Judge Bacon selected November 14, 2019, as the

trial date for the violations concerning the 137 Property. Id. at 33. The same judge also selected

November 21, 2019, as the trial date for the violations concerning the 139 Property. Id.

Plaintiff ultimately represented himself pro se during the one-day jury trial held on

November 14, 2019, in the New Paltz Town Justice Court for the 137 Property. See Dkt. No. 39-

2. According to the Complaint, the jury was "hand picked" and not "impartial . . . ." Compl. at

46–47. For instance, "[t]he jury pool . . . included personal friends of Judge . . . Bacon . . . ." Id.

at 46. Judge Bacon even stated on the record that he personally knew one of the jurors. Id.

"[T]hat same juror [also] stat[ed] on the record[] that he kn[e]w[] . . . [A]ttorney . . . Barry from

the time that [the] juror . . . worked on the New Paltz planning board and . . . [A]ttorney [Barry]

worked on the New Paltz town board." Id. Another juror "stated that her landlord did not heat

part of her rental apartment," which suggested she was biased against landlords like Plaintiff. Id.

At the end of the trial, the jury found Plaintiff guilty of "convert[ing] the 137 Property

from "a single-family residence into a boarding house" and "convert[ing] [the] one dwelling unit

into two dwelling units . . . ." Dkt. No. 39-2 at 354, 357. Following the verdict, Plaintiff was

sentenced to 90 days in Ulster County Jail and ordered to pay a $5,000 cumulative fine for the

period which the 137 Property was alleged to be noncompliant. Id. at 365; see also Compl. at 52.

Attorney Barry then requested that Judge Bacon "direct [Plaintiff] at a future date to turn himself

in to serve his sentence rather than directing that he be taken directly from [the courtroom] to the

Ulster County jail given his diabetes condition." Dkt. No. 39-2 at 366–67. The Court granted the

request and directed that Plaintiff begin his sentence on January 7, 2020, so that Plaintiff could

spend "the holidays with [his] family . . . ." Id. at 371.

On November 18, 2019, as the trial for the 139 Property approached, Plaintiff filed an

"appeal to the zoning board," which "stayed all criminal proceedings for the 139 Route 208[,]

LLC." Compl. at 56. That same day, "[A]ttorney . . . Barry wrote to . . . Judge [Bacon] . . . advising [him] that because [Plaintiff] had filed an appeal with the zoning board, the criminal proceedings were stayed," and asked that Judge Bacon "adjourn the trial date" set for November 21, 2019. Id. (citing Dkt. No. 39-3 at 54). Judge Bacon appears to have granted the request, given that Plaintiff later pled guilty to the 139 Property charges in February 2020. See Dkt. No. 39-3 at 228. In December, before he started serving his sentence, Plaintiff filed a motion for bail pending appeal. Id. at 283–91. Judge Bacon ultimately denied that motion, as well as Plaintiff's motions to (1) vacate the jury's guilty verdicts, (2) dismiss the appearance ticket and criminal complaint on speedy trial grounds, and (3) reconstruct the transcript from the jury trial. Id. at 293–95.

Plaintiff began his 90-day sentence upon entering the Ulster County Jail on January 7, 2020. Compl. at 56. While Plaintiff was incarcerated, the Ulster County Defendants repeatedly denied Plaintiff access to his prescription medications for managing his diabetes and his prostate. Id. at 63. This happened partly because he was incarcerated under the incorrect name of "Anthony" instead of "Angelo." Id. at 64. Plaintiff also states that his wife brought his prescription medications to the jail directly, but the Ulster County Defendants "still failed to administer" them to Plaintiff. Id.

Because he was being denied his diabetes medications, Plaintiff's "blood sugars" became "uncontrolled"—that is, his "blood sugar numbers" increased three to four times his normal level. Id. at 63–64. His condition was made even worse because the Ulster County Defendants also "provided only improper food trays for diabetics. Each meal consisted of either bread, rice, pasta[,] and potatoes . . . ." Id. at 65; see also Dkt. No. 39-3 at 60–61. Having been denied access to his prostate medications, Plaintiff also suffered from "a severely restricted urine stream."

Compl. at 65. These events ultimately led Plaintiff to file a medical grievance with the Ulster County Jail for being denied access to his prescription medications. Id. at 68.

On February 3, 2020, while Plaintiff was still incarcerated, his "wife [on Plaintiff's behalf] retained the services of a New Paltz criminal defense lawyer named Michael Cohn." Compl. at 69; see also Dkt. No. 39-3 at 274 (Plaintiff "dictated [emails to counsel] through his wife via jail calls"). A week later, while still serving his sentence, Plaintiff then appeared before New Paltz Town Justice Court with his counsel for resentencing to secure an early release from jail, "so that [Plaintiff] could immediately resume [his] prescribed medication[s]." Compl. at 70; see also Dkt. No. 39-3 at 274–75. Plaintiff was "under extreme duress" at this appearance "as a result of the pain and suffering" from "not being administered [his] prescribed medications for over a month, and not being provided with appropriate food trays." Compl. at 68.

During this appearance, Plaintiff signed a waiver of appeal for his November 2019 conviction on the "repeated urging" of his retained counsel. Id. at 70. For instance, "Mr. Cohn repeatedly assured [Plaintiff] that the waiver of appeal would never stand up in court due to [his] being denied [his] prescribed medications while in jail." Id. After signing the waiver of appeal with respect to his November 2019 conviction regarding the 137 Property, Plaintiff was resentenced to time served and was released from custody the same day. Id. at 68; Dkt. No. 39-3 at 275. Plaintiff also pled guilty to two counts of violating the New Paltz Town Code with respect to the 139 Property, which resulted in an additional fine of at least $5,000. Dkt. No. 39-3 at 21, 228; see also Compl. at 57 (alleging that "Judge . . . Bacon . . . order[ed] [Plaintiff] to pay personally a $7,500 fine or go back to jail"). This fine stood at $7,500 after Plaintiff "failed to pay [his] fine as scheduled on May 5, 2020." Dkt. No. 39-3 at 20. Finally, the Court "ordered [Plaintiff's Properties] to undergo a series of special inspections by the building inspector, over

the course of the next 12 months . . . ." Dkt. No. 39-1 at 16. According to Plaintiff, Delarede later "rescinded th[is] court order, presumably with the court's permission," after Plaintiff demonstrated to her in a letter that her demands conflicted with the requirements of "the New York State Fire Safety code . . . as well as the SUNY New Paltz fire safety policy . . . ." Id. (citing Dkt. No. 39-3 at 69–70).

Plaintiff's attorney filed a notice of appeal regarding the 139 Property guilty plea conviction at Plaintiff's request. Dkt. No. 39-3 at 275, 228. However, the attorney ultimately informed Plaintiff that "he could not handle the appeal because he was too sick . . . and because [Plaintiff] was making it too difficult for him . . . ." Compl. at 70. Plaintiff's counsel then petitioned to withdraw from the representation. Id. at 71. Despite Plaintiff opposing "this attempt at client abandonment[]," the Ulster County Supreme Court granted the application to withdraw. Id. Plaintiff then filed a motion for reconsideration because his counsel did not account for unused funds from the initial retainer. Id. Plaintiff also asked the court to assign different counsel to handle his appeal. Id. A "judge from Sullivan County" denied the reconsideration request and the motion to assign substitute counsel. Id. at 72. "This le[ft] [Plaintiff] with no other option than to have a hearing heard on the merits in th[is] . . . matter[] in [f]ederal [c]ourt . . . ." Id. at 72–73.

### B.  Procedural History

Plaintiff initiated the instant action pro se on November 15, 2021, by filing a complaint pursuant to 42 U.S.C. § 1983 ("Section 1983"), in the Southern District of New York. Dkt. No. 1 at 1, 7–8. On November 18, 2021, Judge Seibel issued an Order to Show Cause for maintaining the suit in the Southern District. Dkt. No. 10. Judge Seibel concluded that unless Plaintiff could show cause, the action should be transferred to the Northern District of New York pursuant to 28

U.S.C. §1404(a). Id. Judge Seibel added that "Defendants are not required to respond to

Plaintiff's complaint until after Plaintiff has complied with this order." Id.

On December 6, 2021, Plaintiff opposed transfer, stating that venue was proper in the

Southern District because Jaffee's office of record and Plaintiff's residence are in that District.

Dkt. No. 11 at 5. Additionally, Plaintiff stated that traveling to a venue in the Northern District of

New York would be "overly burdensome and detrimental to health on the Plaintiff." Id. at 4.

On December 21, 2021, Plaintiff moved for default judgment against the Town of New

Paltz and Sheriff Juan Figueroa of Ulster County for failing to answer Plaintiff's initial

complaint. Dkt. Nos. 18, 20. Judge Seibel denied both default judgment motions because of

Plaintiff's failure to comply with her "Individual Practice[]" that "default judgments must be

sought via Order to Show Cause." Dkt. Nos. 22–23. On December 28, 2021, Plaintiff filed new

motions for default judgment against the Town of New Paltz, Sheriff Figueroa, and Judge Bacon

for failing to answer his initial complaint. Dkt. Nos. 24–27. Judge Seibel denied the motions, and

"extended" the "Defendants['] time to respond to the Complaint . . . to [January 14, 2022] nunc

pro tunc." Dkt. No. 28.

On January 10, 2022, the New Paltz Defendants requested a pre-motion conference on

their "contemplated motion to dismiss pursuant to [Federal] Rule [of Civil Procedure] 12(b)(6),"

pursuant to ¶ 2(A) of Judge Seibel's Individual Practice Rules. Dkt. 32 at 1. Judge Seibel granted

the request for a pre-motion conference and scheduled it for February 22, 2022. Dkt. No. 33.

Judge Seibel also instructed "Plaintiff to state [his] position [on the motion], by letter of no more

than 3 pages, by February 15, 2022." Id. On January 12, 2022, Sheriff Figueroa, Jane Doe, and

John Doe answered the initial complaint with a jury demand. Dkt. No. 36.

On January 21, 2022, Plaintiff then filed his amended Complaint, "add[ing] Ulster County as an additional defendant," while terminating Jane Doe, and "add[ing] an additional [c]laim . . . ." Compl. at 76. On February 14, 2022, the Ulster County Defendants filed their answer to the amended Complaint with a jury demand. Dkt. No. 47.

On February 22, 2022, Judge Seibel held a telephonic conference with the parties to discuss the issue of venue, and ultimately determined that the "case will be transferred to the Northern District of New York due to [her] finding no basis for this case being held in the Southern District." Dkt. Entry dated Feb. 22, 2022. After the conference concluded, Judge Seibel issued a written order transferring the case to the Northern District, and ordered the New Paltz Defendants to answer the Complaint by March 15, 2022. Dkt. No. 52; see also Dkt. Entry dated Feb. 23, 2022.

On March 15, 2022, the New Paltz Defendants filed their Motion to Dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) in this Court. See Mot. On March 29, 2022, Plaintiff opposed the Motion, Dkt. No. 57 ("Plaintiff's Response"), and sought to amend another claim to his Complaint by raising it in his Response, id. at 17. The New Paltz Defendants filed their reply on April 12, 2022, Dkt. No. 64 ("Defendants' Reply"), after the Court granted an an extension, Dkt. No. 61.

On April 19, 2022, Plaintiff filed a sur-reply. Dkt. No. 66 ("Plaintiff's Sur-reply"). The Court informed Plaintiff that a sur-reply was "not permitted" as of right under Local Rule of Practice 7.1(a)(1) but allowed for it in this instance because of Plaintiff's pro se status. Dkt. No. 67. "In the interest of justice," the Court also granted the New Paltz Defendants "the opportunity to respond to Plaintiff's sur-reply," id., which they did in a filing submitted to the Court on April 27, 2022, Dkt. No. 68 ("Defendants' Sur-reply Response").

12

On June 1, 2022, the New Paltz Defendants filed a letter brief with the Court enclosing a May 13, 2022, decision from the New York State Supreme Court, Ulster County, dismissing Plaintiff's appeal from the judgment pursuant to Plaintiff's plea of guilty to two violations of the Town of New Paltz Code. Dkt. No. 69 ("Defendants' Letter Brief"). On June 7, 2022, Plaintiff responded to Defendants' Letter Brief. Dkt. No. 70 ("Plaintiff's Response to Defendants' Letter Brief"). The Court accepted both filings on June 9, 2022, Dkt. No. 71, but warned in a text order that "ANY FUTURE SURREPLIES with regard to the pending Motion to Dismiss SHALL BE STRICKEN FROM THE RECORD," id. Plaintiff sought reconsideration of that order in a subsequent filing, Dkt. No. 72, which the Court denied, Dkt. No. 73. The Court also struck Plaintiff's filing from the docket insofar as it served as an additional sur-reply. Id.

### C. Nature of Plaintiff's Claims and Requested Relief

As noted above, Plaintiff initiated "this federal civil rights lawsuit," Compl. at 73, pursuant to Section 1983, id. at 10. In addition to his Section 1983 claims, Plaintiff also brings claims under the New York State Human Rights Law ("NYSHRL"), id. at 10, the law of fraud in New York, Dkt. No. 39-1 at 33, and President Joe Biden's July 9, 2021, Executive Order on Promoting Competition in the American Economy, id. at 33. In his Complaint, Plaintiff also contends that his "lawsuit is not a collateral attac[k] on a State conviction, because" the violations described in the Complaint mean that "there was never a State conviction in the underl[y]ing case." Id. at 73. Rather, "[w]hat is being attacked is being committed to jail without a separate and specific verdict of guilty by the jury . . . ." Id.

Plaintiff seeks $3,000,000 for the violations described in his Complaint, and another "$3,000,000 for the taking of property by restricting occupancy to 5 persons maximum when in 2016 the property was permitted to have 7 occupants in [the] 139 [Property] and 6 occupants in

[the] 137 [Property] and neighboring properties are allowed to operate without similar restrictions." Id. at 73–74; see also Buffalo Teachers Fed'n v. Tobe, 464 F.3d 362, 373–74 (2d Cir. 2006) ("The Takings Clause of the Fifth Amendment provides that no 'private property shall be taken for public use, without just compensation.' U.S. Const. amend. V. The clause applies to the states through the Fourteenth Amendment." (citing Kelo v. New London, 545 U.S. 469, 472 n.1 (2005))).

In his first exhibit attached to the Complaint, Plaintiff outlines the legal violations he allegedly suffered in more detail, and specifically identifies thirty-eight claims that purportedly entitle him to relief. See Dkt. No. 39-1. Throughout this list, Plaintiff identifies the various constitutional provisions he argues gives rise to his claims, including the Due Process and Takings Clauses of the Fifth Amendment, various provisions of the Sixth Amendment, the Cruel and Unusual Punishments and Excessive Fines Clauses of the Eighth Amendment, and the Due Process and Equal Protection Clauses of the Fourteenth Amendment. See id. Plaintiff brings two of these thirty-eight claims—numbered three and fourteen—solely against the Ulster County Defendants, to the exclusion of the New Paltz Defendants. See id. at 3–4, 13–14. Plaintiff states the remainder of these claims against various combinations of the New Paltz Defendants, although Plaintiff never expressly mentions Bettex in the Complaint's factual allegations, see Compl., nor in his exhibit outlining his thirty-eight claims, see Dkt. No. 39-1.

In his Response to the Motion to Dismiss, Plaintiff also seeks to amend a thirty-ninth "claim against the Town of New Paltz and [Judge] . . . Bacon . . . ." Pl.'s Resp. at 17. Given Plaintiff's pro se status, the Court analyzes this thirty-ninth claim as well. See Warmin v. New York City Dep't of Educ., No. 16-CV-8044, 2018 WL 1441382, at *5 (S.D.N.Y. Mar. 22, 2018) ("In recognition of the special solicitude owed a *pro se* Plaintiff, the Court will liberally construe

14

Plaintiff's submissions and analyze these claims [stated in his opposition to the motion to dismiss] as well." (emphasis in original)); but see Mira v. Argus Media, No. 15-CV-9990, 2017 WL 1184302, at *3 n.4 (S.D.N.Y. March 29, 2017) (declining to consider new legal claims, as opposed to additional facts, raised in a legal brief or other submission by a pro se litigant in response to a motion to dismiss).

Apart from Plaintiff's state-law claims, his Executive Order claim, and his Section 1983 Takings Clause claim, Plaintiff's remaining Section 1983 claims against the New Paltz Defendants can roughly be categorized into two groups: (1) the constitutional violations Plaintiff suffered in the period from the filing of criminal charges in October 2018 to the commencement of trial, and (2) the constitutional violations he suffered during and after trial.[2]

With respect to the first group of Section 1983 claims against the New Paltz Defendants, these alleged violations include: (a) not providing Plaintiff with a supporting deposition, Dkt. No. 39-1 at 2–3, 22–23; (b) filing criminal charges against Plaintiff based on a "misdemeanor complaint" despite Plaintiff "never [having] waived" "prosecution by information," id. at 3; (c) "never" informing Plaintiff "as to what law or penal code section [he] had violated that could l[a]nd [him] in jail," id. at 18, (d) not setting a date for trial within thirty days of the arraignment, id. at 5–6; (e) "prosecut[ing] [Plaintiff] in 2019 for substantially the same act that was remedied and settled" back in 2016, (f) not naming Plaintiff's real name in "[t]he order to remedy" issued in 2018, id. at 10–11, 20–21; (g) charging Plaintiff for an activity permitted as a "pre-existing

---

[2] With respect to conduct prior to the filing of criminal charges in October 2018, Plaintiff has clarified in his Response to the Motion to Dismiss that his "case is not premised on any of the events that transpired in 2015 and 2016, when the Town of New Paltz filed numerous criminal charges for a building code violation, but then withdrew those charges because that matter was settled when . . . [Plaintiff] undertook to make substantial improvements to the property . . . ." Pl.'s Resp. at 1–2. "[T]his case is based and premised solely on the violations and events that transpired in 2018, 2019, and 2020." Id. at 2

non-conforming use" before the New Paltz Building Code "came into existence," id. at 26; (h) "never serv[ing]" Plaintiff with a "certificate of compliance/readiness," which he argues is required for a "prosecution . . . [to] be deemed ready for trial," id. at 27; and (i) never informing Plaintiff "of his right to have counsel appointed as a result of [a] criminal matter that could l[a]nd him in jail," id. at 29.

With respect to Plaintiff's second group of claims concerning the events at trial and beyond, the alleged violations include: (a) trying Plaintiff before a judge with a conflict of interest, id. at 6–8; (b) trying Plaintiff by a biased and conflicted jury, id. at 11–12; (c) trying Plaintiff under a false name, id. at 24, 28–29; (d) trying Plaintiff in a court without jurisdiction over him, id. at 6; (e) forcing Plaintiff to stand trial without an attorney, id. at 29, 34–35; (f) failing to grant a recess during trial despite Plaintiff's medical disabilities, id. at 13–14; (g) excluding evidence of selective enforcement at trial, id. at 26; see also Compl. at 57–58 (describing the discriminatory conduct against "those who do business as off[-]campus housing operators in the Town of New Paltz, but do not live in New Paltz"); (h) allowing Attorney Barry to use evidence at trial not disclosed in advance of trial, Dkt. No. 39-1 at 26–27; (i) allowing Attorney Barry to "introduce a notice of claim filed by [Plaintiff] against the Town" of New Paltz as evidence at trial, id. at 27; (j) failing to poll the jury or inform the jurors that their verdict must be unanimous, id. at 14, 32; (k) failing to provide a verdict sheet, id. at 28; (l) allowing Plaintiff to be convicted and sentenced for the acts of an LLC, id. at 30–32; (m) "failing to grant" Plaintiff "a certificate of relief due to [his] disabilities" when the court pronounced his sentence, Pl.'s Resp. at 17; (n) ordering Plaintiff to pay illegally high fines, id. at 12–13; (o) failing to direct Plaintiff where to pay the fines, id. at 24; (p) disallowing payment of fines via credit card, id. at 24–25; (q) refusing to provide Plaintiff with a trial transcript in connection with his appeal,

id. at 5; (r) refusing bail to Plaintiff pending his appeal, id. at 19–20; (s) coercing a guilty plea from Plaintiff despite a stay of the proceedings, id. at 9–10; (t) requiring Plaintiff to sign a waiver of appeal as a condition for his early release and resentencing, id. at 15–16; (u) forcing Plaintiff to violate the rights of certain protected groups under the NYSHRL and federal housing policies due to the enforcement action, id. at 21–22; and (v) requiring Plaintiff to undertake changes to his Properties after his convictions but later rescinding them after Plaintiff demonstrated that the changes were at odds with "the New York State Fire Safety code . . . as well as the SUNY New Paltz fire safety policy," id. at 15–17.

For a more complete statement of Plaintiff's claims against the New Paltz Defendants, including additional details regarding whom exactly Plaintiff seeks to hold responsible for the specific violations outlined above, reference is made to Plaintiff's Complaint, his first exhibit, and pages seventeen and eighteen of his Response to the Motion to Dismiss. See Compl.; Dkt. No. 39-1; Pl.'s Resp. at 17–18.

## III.    LEGAL STANDARD

Presently before the Court is the New Paltz Defendants' Rule 12(b)(6) Motion to Dismiss Plaintiff's Complaint. See Mot. "[A] judgment of dismissal pursuant to Fed. R. Civ. P. 12(b)(6) can only be entered if a court determines that, as a matter of law, a plaintiff failed to state a claim upon which relief can be granted . . . ." Melendez v. City of New York, 16 F.4th 992, 1010 (2d Cir. 2021). "In determining if a claim is sufficiently 'plausible' to withstand dismissal," id. (quoting Iqbal, 556 U.S. at 678), a court "accept[s] all factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff," Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt., 843 F.3d 561, 566 (2d Cir. 2016) (citation omitted). A court, however, need not accept "conclusory allegations or legal conclusions couched as factual . . . allegations." Nielsen

v. Rabin, 746 F.3d 58, 62 (2d Cir. 2014) (quoting Rothstein v. UBS AG, 708 F.3d 82, 94 (2d Cir.

2013)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice." Iqbal, 556 U.S. at 678 (citing Bell Atlantic Corp. v. Twombly, 550

U.S. 544, 555 (2007)). "[W]here the well-pleaded facts do not permit the court to infer more than

the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that

the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

      "In considering a motion to dismiss for failure to state a claim . . . a district court must

limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits

. . . ." Kramer, 937 F.2d at 773. However, "a district court . . . may also consider matters of

which judicial notice may be taken under Fed.R.Evid. 201." Id. Specifically, "a court may take

judicial notice of prior pleadings, orders, judgments, and other related documents that appear in

the court records of prior litigation and that relate to the case sub judice." Jianjun Lou v. Trutex,

Inc., 872 F. Supp. 2d 344, 349 n.6 (S.D.N.Y. 2012). While "a court may take judicial notice of a

document filed in another court to establish the fact of such a document," a court "cannot take

judicial notice of the factual findings of another court." In re Olympia Off. LLC, 585 B.R. 661,

667 (E.D.N.Y. 2018).

      "*Pro se* complaints are held to less stringent standards than those drafted by attorneys,"

and courts are "required to read [a] plaintiff's *pro se* complaint liberally, interpreting it as raising

the strongest arguments it suggests." Johnson v. Darby, 142 F. Supp. 3d 275, 277 (E.D.N.Y.

2015) (emphasis in original). "However, while the special leniency afforded to *pro se* civil rights

litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second

Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the

pleading standards set forth in FED. R. CIV. P. 8, 10 and 12." Vega v. Artus, 610 F. Supp. 2d

185, 195–96 (N.D.N.Y. 2009) (emphasis in original) (footnotes omitted). And while the Second

Circuit has repeatedly "said that a *pro se* litigant is entitled to 'special solicitude,'" <u>Triestman v.

Fed. Bur. Prisons</u>, 470 F.3d 471, 477 (2d Cir. 2006) (emphasis in original) (quoting <u>Ruotolo v.

I.R.S.</u>, 28 F.3d 6, 8 (2d Cir. 1994)), it has "also indicated that [courts] cannot read into *pro se*

submissions claims that are not 'consistent' with the *pro se* litigant's allegations . . . or

arguments that the submissions themselves do not 'suggest,' . . . ." <u>Triestman</u>, 470 F.3d at 477

(emphasis in original) (citations omitted). Courts "should [also] not 'excuse frivolous or

vexatious filings by *pro se* litigants,' . . . ." <u>Id.</u> (emphasis in original) (quoting <u>Iwachiw v. State

Dep't of Motor Vehicles</u>, 396 F.3d 525, 529 n.1 (2d Cir. 2005)).

## IV.    DISCUSSION

In their Motion, the New Paltz Defendants advance numerous arguments for why

Plaintiff's Complaint should be dismissed in its entirety. <u>See</u> Dkt. No. 56-5 ("Defendants'

Memorandum"). But before the Court addresses the merits of the Motion, the Court must first

address Plaintiff's threshold argument that the Motion is "untimely" and should be denied on that

ground alone. Pl.'s Resp. at 5–7.

Plaintiff contends that the Motion "was not served on [him] until" March 18, 2022—three

days after the New Paltz Defendants were obligated to file an answer or otherwise respond to the

amended Complaint. <u>Id.</u> at 6. Because the New Paltz Defendants failed to account for the "3

days" it would take for the Motion documents to arrive in Plaintiff's mailbox, Plaintiff argues

that the Motion "is not timely." <u>Id.</u>

Federal Rule of Civil Procedure 5(b), which governs the service of "written motion[s],"

Fed. R. Civ. P. 5(a)(1)(D), provides that "[s]ervice by mail is complete upon mailing," Fed. R.

Civ. P. 5(b)(2)(C). The Second Circuit has also "h[e]ld that service under Rule 5(b) is

accomplished when the envelope is deposited at a post office or in a mail box." Greene v. WCI Holdings Corp., 136 F.3d 313, 315 (2d Cir. 1998).

Here, the attorney for the New Paltz Defendants filed a sworn certificate of service with this Court, stating that the Motion documents were "mail[ed] . . . in a sealed envelope . . . to the last known address of" Plaintiff "on March 15, 2022." Dkt. No. 56-18 at 1. Plaintiff has offered no reason to doubt the veracity of the attorney's representation. Cf. Greene, 136 F.3d at 315 (recounting how "[t]he magistrate judge and district court considered and rejected [plaintiff's] argument" that defendants' representation about the date of placing the envelope in the mailbox was false, and finding that "their decision to believe the defendants' affidavit . . . [swearing to the date of mailing] was not clearly erroneous"). Therefore, the Court finds there is no reason to doubt that the New Paltz Defendants served the Motion on March 15, 2022—the day the Motion documents were mailed—and thus the Motion is timely. Accordingly, the Court proceeds to analyze the various bases upon which Defendants advocate for dismissal of the Complaint.

### A. Claims Against Judge James Bacon and the New Paltz Town Justice Court

Plaintiff raises more than two dozen claims against Judge Bacon in his individual capacity.[3] The New Paltz Defendants argue that the Court should dismiss them under the doctrine of "absolute judicial immunity." Defs.' Mem. at 17–18.

---

[3] Plaintiff also raises dozens of claims against "the New Paltz Town Court." See Dkt. No. 39-1. However, Plaintiff does not identify "the New Paltz Town Court" as a named Defendant in the caption of his Complaint or his list of Defendants, Compl. at 1, 3–6, and it appears that he has never attempted to serve his Complaint on that judicial entity, see Dkt. Nos. 44–46. It may be that Plaintiff sees no distinction between the Town and the Town Justice Court—viewing the latter as an extension of the former. See, e.g., Dkt. No. 39-1 at 11 (Plaintiff complaining of "the New Paltz Town Court['s]" conduct but then stating that the "violations were committed . . . by the Town of New Paltz and its named employees"). But the New Paltz Town Justice Court is an extension of the New York State Unified Court System, not the Town of New Paltz. See N.Y. Uniform Just. Ct. Act § 102; see also People v. Davey, 943 N.Y.S.2d 829, 833 (N.Y. Just. Ct. 2012) (concluding the Town Courts are part of the New York State Unified Court System).

"It is well settled that judges generally have absolute immunity from suits for money

damages for their judicial actions." Bliven v. Hunt, 579 F.3d 204, 209 (2d. Cir. 2009) (citations

omitted). "Such judicial immunity is conferred in order to insure 'that a judicial officer, in

exercising the authority vested in him, shall be free to act upon his own convictions, without

apprehension of personal consequences to himself.'" Bliven, 579 F.3d at 209 (quoting Bradley v.

Fisher, 80 U.S. 335, 347 (1871)). The Supreme Court has held that this doctrine of judicial

immunity applies to suits under § 1 of the Civil Rights Act of 1871, 42 U.S.C. § 1983, for "the

legislative record" pertaining to Section 1983 "gives no clear indication that Congress meant to

abolish wholesale . . . the [absolute] immunity of judge for acts within the judicial role . . . ."

Pierson v. Ray, 386 U.S. 547, 554–555 (1967).

The Supreme Court has further clarified "that [judicial] immunity is overcome in only

two sets of circumstances." Mireles v. Waco, 502 U.S. 9, 11 (1991). "First, a judge is not

immune from liability for nonjudicial actions, *i.e.*, actions not taken in the judge's judicial

capacity." Id. (citing Forrester v. White, 484 U.S. 219, 227–229 (1988)), and Stump v.

Sparkman, 435 U.S. 349, 360 (1978).[4] "Second, a judge is not immune for actions, though

---

[4] The Second Circuit often relies on the Supreme Court's decision in Stump v. Sparkman, 435 U.S. 349, to articulate the controlling test for whether absolute judicial immunity applies to a judicial officer's acts. See, e.g., Bliven, 579 F.3d at 210 (citing Stump, 435 U.S. at 362–64). So too has this Court in the past. See, e.g., Walker v. Fam. Ct. Judge Catherine Cholakis, No. 19-CV-1288, 2020 WL 3503158, at *6 (N.D.N.Y. June 29, 2020) (Kahn, J.) (citing Stump, 435 U.S. at 356–57). At present, while the Court acknowledges that Stump remains one of several cases that articulate the controlling legal standard for evaluating the defense of absolute judicial immunity, the Court agrees with Justice Stewart, in dissent, that "what Judge Stump did on July 9, 1971," i.e., approving a mother's petition to sterilize her daughter in an ex parte proceeding without a hearing and without notice to the daughter or appointment of a guardian ad litem, "was beyond the pale of anything that could sensibly be called a judicial act." Stump, 435 U.S. at 365 (Stewart, J., dissenting). Defendants have not relied on Stump in their papers. See Defs.' Mem. at 17–18; Defs.' Reply at 9–10. Given the Court's grave concerns about how the majority applied the test for judicial immunity in Stump, the Court will also not rely on the majority's analysis as a comparator for what acts may or may not qualify as "judicial" in Plaintiff's case.

judicial in nature, taken in the *complete absence* of all jurisdiction." <u>Mireles</u>, 502 U.S. at 12 (emphasis added) (citations omitted).

"[T]he Supreme Court has generally concluded that acts arising out of, or related to, individual cases before the judge are considered judicial in nature." <u>Bliven</u>, 579 F.3d at 210 (collecting cases). "In contrast, a judge's '[a]dministrative decisions, even though they may be essential to the very functioning of the courts, have not similarly been regarded as judicial acts." <u>Id.</u> (alterations in original) (quoting <u>Forrester</u>, 484 U.S. at 228).

The Second Circuit has also articulated a two-pronged test for determining whether a judge has acted in "clear absence of all jurisdiction," thereby losing the protection of absolute judicial immunity. <u>See</u> <u>Tucker v. Outwater</u>, 118 F.3d 930, 936 (2d Cir. 1997). "The first element of the test is an 'objective' inquiry as to whether 'jurisdiction is clearly absent, *i.e.*, . . . no reasonable person would have thought jurisdiction proper.'" <u>Id.</u> (alterations in original) (quoting <u>Maestri v. Jutkofsky</u>, 860 F.2d 50, 53 (2d Cir. 1988)). "The second element of the test is a subjective inquiry as to whether 'the judge whose actions are questioned actually knew or must have known' that he was acting in the clear absence of all jurisdiction." <u>Tucker</u>, 118 F.3d at 936 (citing <u>Maestri</u>, 860 F.2d at 53).

In his Response to the Motion, Plaintiff emphasizes that "no judicial immunity applies if the judge does not have jurisdiction over the matter or commits criminal acts while in the course of purporting to act pursuant to his judicial authority." Pl.'s Resp. at 21. Applying this standard to Judge Bacon, Plaintiff argues that "at all relevant times[,] Judge Bacon lacked jurisdiction because," as alleged in the Complaint, Judge Bacon "prosecuted both the LLC and the property manager under a misdemeanor complaint when that is specifically prohibited under New York [state law] without converting that misdemeanor complaint into an informational by

supplementing the complaint with a supporting deposition." Id. at 23. Plaintiff also argues that because Judge Bacon failed to schedule a trial in accordance with the "New York State Justice Court Act [§] 1301," and "fail[ed] to comply with [other] laws, rules[,] and regulations," Judge Bacon "never obtained jurisdiction over the defendant . . . ." Id. at 24. Plaintiff also contends that Judge Bacon's acts, such "submitting a written instrument . . . to . . . the Sheriff of Ulster County" with Plaintiff's "false" name, were "administrative" and not judicial in nature, and that Judge Bacon committed "a felony under the New York State Penal Code[]" when he obscured Plaintiff's "true name and identity[]" "on the commitment order to jail . . . ." Id. at 25.

With respect to Plaintiff's first argument regarding Judge Bacon's jurisdiction over the complained-of prosecution, the Court finds that Plaintiff has failed to plausibly allege that Judge Bacon acted in a "complete absence of jurisdiction." Tucker, 118 F.3d at 936. While the Court "accept[s] all [of Plaintiff's] factual allegations [regarding Judge Bacon's conduct] as true and draw[s] all reasonable inferences [his] favor," Ivy Asset Mgmt., 843 F.3d at 566, the Court does not accept Plaintiff's "legal conclusions" regarding Judge Bacon's jurisdiction or lack thereof. Nielsen, 746 F.3d at 62 (noting that a court need not accept "conclusory allegations or legal conclusions couched as factual . . . allegations").

In New York, "[a] town court" qualifies as a "[l]ocal criminal court," N.Y. Crim. Proc. Law § 10.10(3)(d), which has "[t]rial jurisdiction of misdemeanors concurrent with that of the superior courts," id. § 10.30(1)(b); see also Defs.' Reply at 9 ("Town justice courts have original jurisdiction over . . . misdemeanors occurring within their jurisdictions." (citing N.Y. Crim. Proc. Law §§ 10.20, 10.30, 20.50)). Plaintiff's Complaint and his attached exhibits make clear that he was prosecuted for misdemeanors pursuant to a specific provision of the New Paltz Town Code. See, e.g., Dkt. No. 39-3 at 158 (stating that Plaintiff's "actions constitut[e] violations of Section

23

140-8B of the Code of the Town of New Paltz"). That same Code states that for "the purpose of conferring jurisdiction upon courts and judicial officers generally, violations of [Section 140] shall be deemed misdemeanors." New Paltz Town Code § 140-58(B). Given the above, the Court finds that, at the very least, a "reasonable person would have thought jurisdiction proper." Maestri, 860 F.2d at 53.

As for Plaintiff's related argument that certain procedural defects rendered Judge Bacon "without jurisdiction," that is also not enough to plausibly allege that Judge Bacon acted in the "*complete absence* of jurisdiction." Tucker, 118 F.3d at 936 (emphasis added). Nowhere in the Complaint (or his exhibits) does Plaintiff allege that Judge Bacon "actually knew or must have known" that the various alleged defects with the misdemeanor prosecution rendered Judge Bacon's jurisdiction over the matter completely absent. Maestri, 860 F.2d at 53. That Plaintiff lodged some of his procedural and jurisdictional objections before Judge Bacon in the leadup to trial, Compl. at 31–32, and Judge Bacon rejected them, id. at 32–33, suggests instead that Judge Bacon may have found Plaintiff's objections concerning jurisdiction to be lacking in merit. Whether Judge Bacon was correct on the merits of whether certain defects rendered him without jurisdiction over Plaintiff and his misdemeanor proceeding is beside the point, since acting in mere excess of a judge's jurisdiction is not enough to pierce through the judge's immunity. Cf. Gross v. Rell, 585 F.3d 72, 84 (2d Cir. 2009) ("[T]here is a difference between *exceeding* jurisdiction and acting the *absence* of jurisdiction: if a probate judge, with jurisdiction over only wills and estates, should try a criminal case, he would be acting in the clear absence of jurisdiction and would not be immune from liability for his action; on the other hand, if a judge of a criminal court should convict a defendant of a nonexistent crime, he would merely be acting in excess of his jurisdiction and would be immune." (emphasis in original)).

24

As for Plaintiff's argument regarding the nature of the acts for which Judge Bacon is being sued, the Court also finds these alleged acts were "judicial," and not "administrative" as Plaintiff contends. Again, while the Court credits Plaintiff's factual allegations regarding Judge Bacon's acts as true, the Court may not defer to Plaintiff's "legal conclusion" about what constitutes a "judicial" or "administrative" act. See Nielsen, 746 F.3d at 62 (noting that a court need not accept "conclusory allegations or legal conclusions couched as factual . . . allegations"). For the purposes of this analysis, the Supreme Court has instructed: "Whether the act done by [a judge] was judicial or not is to be determined by its character, and not by the character of the agent. . . ." Ex parte Virginia, 100 U.S. 339, 348 (1880). "Such administrative actions include demoting or dismissing a court employee . . . compiling general jury lists to affect all future trials . . . [or] promulgating a code of conduct for attorneys, though for that function [judges] have been held entitled to legislative immunity." Bliven, 579 F.3d at 210 (citations omitted).

All of Plaintiff's claims against Judge Bacon concern decisions that Judge Bacon made in his role as an adjudicator for Plaintiff's misdemeanor trial. See, e.g., Dkt. No. 39-1 at 6–8 (complaining that Judge Bacon failed to recuse himself); id. at 13–14 (complaining that Judge Bacon failed to grant a recess during trial); id. at 26–27 (complaining that Judge improperly excluded and admitted certain evidence at trial). None of the acts that Plaintiff complains of were "administrative" in nature, including his allegation that Judge Bacon tried him by a "hand picked" and biased jury. Compl. at 46–47; cf. Ex parte Virginia, 100 U.S. at 348 (declining to extend immunity to a county judge who had been charged in a criminal indictment with discriminating on the basis of race in selecting trial jurors for the county's courts—finding that "[w]hether the act done by him was judicial or not is to be determined by its character, and not by the character of the agent," and stating that this was a function that "might as well have been

committed to a private person as to one holding the office a judge"). While Plaintiff suggests that the jury pool was not "randomly selected," and is therefore inconsistent with the Sixth Amendment, see Compl. at 46 (citing Dkt. No. 39-3 at 88), Plaintiff never alleges that Judge Bacon was "personally involved" in the administrative act of compiling the jury pool. Whitton v. Williams, 90 F. Supp. 2d 420, 427 (S.D.N.Y. 2000) ("A defendant in a § 1983 action may not be held responsible unless he was personally involved in the alleged constitutional violations."); see, e.g., Compl. at 46 (merely alleging that "[t]he [j]ury pool . . . included personal friends of Judge . . . Bacon" and that Judge Bacon "kn[e]w[]" one of the jurors). While the Court has a duty to draw all reasonable inferences in Plaintiff's favor in resolving this Motion, the Court will not craft factual allegations for Plaintiff that do not appear in the Complaint or attached exhibits.

Given that Judge Bacon was not acting in the complete absence of jurisdiction when he undertook the challenged judicial acts, the Court finds that Judge Bacon is entitled to absolute judicial immunity on all claims brought against him. Accordingly, the Court grants the Motion with respect to Judge Bacon.[5]

### B.  Claims Against Attorney Kevin Barry

Plaintiff also brings several claims against Attorney Barry, who prosecuted Plaintiff's misdemeanor proceedings. The New Paltz Defendants argue that the Court should dismiss these claims under the doctrine of "prosecutorial absolute immunity." Defs.' Mem. at 18.

---

[5] Given that "the existence of absolute immunity protects an official not only from liability but also from suit, the validity of the defense should be determined at an early stage." Shmueli v. City of New York, 424 F.3d 231, 236 (2d Cir. 2005). "Further, although absolute immunity is an affirmative defense whose availability depends on the nature of the function being performed by the defendant official who is alleged to have engaged in the challenged conduct, the nature of that function is often clear from the face of the complaint. In that circumstance, the absolute immunity defense may be resolved as a matter of law on a motion to dismiss the complaint pursuant to Rule 12(b)(6)." Id. (internal citations omitted).

In Imbler v. Pachtman, the Supreme Court "h[e]ld . . . that in initiating a prosecution and in presenting the State's case, [a] prosecutor is immune from a civil suit for damages under [Section] 1983." 424 U.S. 409, 431 (1976) (footnote omitted). In other words, for "activities [that are] intimately associated with the judicial phase of the criminal process," a prosecutor is entitled to absolute immunity. Id. at 430. Such activities include "appear[ing] in court in support of an application for a search warrant and . . . present[ing] evidence at that hearing," Burns v. Reed, 500 U.S. 478, 492 (1991), as well as "preparing for the initiation of [other] judicial proceedings or for trial, and which occur in the course of [a prosecutor's] role as an advocate for the State . . . ." Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993).

However, the defense of absolute immunity is "unavailable when [a] prosecutor . . . perform[s] a different function," Kalina v. Fletcher, 522 U.S. 118, 126 (1997), such as when the prosecutor undertakes "acts of investigation or administration," Dory v. Ryan, 25 F.3d 81, 83 (2d Cir. 1994). For instance, "the provision of legal advice to the police during their pretrial investigation of the facts was protected only by qualified, rather than absolute, immunity." Id. (citing Burns, 500 U.S. at 492–96). The same applies to when a prosecutor "h[o]ld[s] a press conference . . . or when he allegedly fabricate[s] evidence concerning an unsolved crime." Kalina, 522 U.S. at 126 (citing Buckley, 509 U.S. at 276–78).

If a court finds that the prosecutor was "engaged in advocative functions," then the prosecutor "will be denied absolute immunity *only* if he acts 'without any colorable claim of authority.'" Bernard v. County of Suffolk, 356 F.3d 495, 504 (2d Cir. 2004) (emphasis added) (quoting Schloss v. Bouse, 876 F.2d 287, 291 (2d Cir. 1989)). "The appropriate inquiry, thus, is not whether authorized acts are performed with a good or bad motive, but whether the acts at issue are beyond the prosecutor's authority." Bernard, 356 F.3d at 504 (emphasis in original).

"Accordingly, where a prosecutor is sued under § 1983 for unconstitutional abuse of his
discretion to initiate prosecutions, a court will begin by considering whether relevant statutes
authorize prosecution for the charged conduct. If they do not, absolute immunity must be
denied." Id. Absolute prosecutorial immunity also protects "officials performing certain
functions analogous to those of a prosecutor," Butz v. Economou, 438 U.S. 478, 515 (1978),
including local executive officers and government attorneys, regardless of whether the
enforcement proceedings they prosecute civil or criminal in nature, see Spear v. Town of W.
Hartford, 954 F.2d 63, 66 (2d Cir. 1992).

In his Response to the Motion, Plaintiff advances several arguments to oppose Attorney
Barry's claim to absolute prosecutorial immunity. First, Plaintiff suggests Attorney Barry may
"not [have been] acting as an advocate," Pl.'s Resp. at 26, but that suggestion is belied by the
allegations in Plaintiff's own Complaint and his attached exhibits. Namely, every claim Plaintiff
brings against Attorney Barry concerns Attorney Barry's conduct as an advocate in Plaintiff's
misdemeanor proceedings. See, e.g., Dkt. No. 39-1 at 21–22 (complaining that Attorney Barry
promised to provide "a supporting deposition . . . but [that] none was ever provided"); id. at 26–
27 (complaining that Attorney Barry used evidence not disclosed in advance of trial, among
other evidentiary abuses). The Court will not defer to Plaintiff's legal characterization of
Attorney Barry's challenged acts as "administrative" in nature, when it is apparent from
Plaintiff's factual allegations that they were "advocative." See Nielsen, 746 F.3d at 62 (noting
that a court need not accept "conclusory allegations or legal conclusions couched as factual . . .
allegations").

Second, Plaintiff argues that prosecutorial immunity should not apply because Attorney
Barry "intentionally perpetrat[ed] a fraud in order to aid and shield municipal colleagues from

off campus student housing competition . . . [which] would amount to a license to steal." Pl.'s Resp. at 26. But again, this argument misses the mark. The question of "whether [Attorney Barry's] acts [were] performed with a good or bad *motive*" is irrelevant to the question of whether prosecutorial immunity applies. Bernard, 356 F.3d at 504 (emphasis in original). "The appropriate inquiry," instead, "is . . . whether the *acts* at issue [were] beyond [Attorney Barry's] authority." Id. (emphasis in original).

To determine whether Attorney Barry's acts were beyond his authority, the Court "consider[s] whether relevant statutes authorize prosecution for the charged conduct." Plaintiff's Complaint and his attached exhibits make clear that he was prosecuted for violations pursuant to a specific provision of the New Paltz Town Code. See, e.g., Dkt. No. 39-3 at 158 (stating that Plaintiff's "actions constitut[e] violations of Section 140-8B of the Code of the Town of New Paltz"). And New York Town Law § 268 clearly authorizes a town to institute any action or proceeding to enforce its zoning ordinances. N.Y. Town Law § 268; see also Defs.' Reply at 64 (citing Town of Southhampton v. Sendlewski, 549 N.Y.S.2d 434 (N.Y. App. Div. 1989)). Accordingly, the authority to prosecute the underlying violations asserted against Plaintiff rested squarely with the Town of New Paltz, and not the Ulster County District Attorney, as Plaintiff suggests in his Sur-reply. See Pl.'s Sur-reply at 2. And as Plaintiff acknowledges throughout his Complaint and his exhibits, the Town of New Paltz appointed Attorney Barry as "its prosecuting attorney" to litigate the enforcement action against Plaintiff. See, e.g., Compl. at 34; Dkt. No. 39-1 at 26.

Given that "the laws [of New York] authorize prosecution for the charged crimes," the Court then "consider[s] whether [Plaintiff has alleged that Attorney Barry] . . . intertwined his exercise of authorized prosecutorial discretion with other, unauthorized conduct." Bernard, 356

F.3d at 504. "For example, where a prosecutor has linked his authorized discretion to initiate or

drop criminal charges to an unauthorized demand for a bribe, sexual favors, or the defendant's

performance of a religious act, absolute immunity has been denied." Id. (citations omitted). Here,

Plaintiff has failed to plausibly plead a direct link to an illegal demand. The closest Plaintiff

comes to alleging such a link is his argument in Response to the Motion that Attorney Barry

"intentionally perpetrat[ed] a fraud in order to aid and shield municipal colleagues from off

campus student housing competition," Pl.'s Resp. at 26, but that allegation is simply a broad

attack on the motive of the prosecution itself. See Bernard, 356 F.3d at 504 (noting that the

question of "whether authorized acts are performed with a good or bad *motive*" is immaterial to

the question of whether prosecutorial immunity applies (emphasis in original)). Nowhere does

Plaintiff plausibly allege that Attorney Barry "linked his authorized discretion to initiate or drop

criminal charges to an unauthorized demand . . . ." Id.

Finally, Plaintiff attempts to pierce through prosecutorial immunity by raising doubts

about Attorney Barry's compliance with various ethical codes of conduct, see, e.g., Pl.'s Sur-

reply at 2, and thus the propriety of his appointment, see, e.g., Pl.'s Resp. at 27. In making this

argument, Plaintiff attempts to introduce "question[s] of fact" about the circumstances of

Attorney Barry's appointment that would preclude this Court from deciding Attorney Barry's

claim to immunity on a motion to dismiss. See Pl.'s Resp. at 27; Pl.'s Sur-reply at 2.

Assuming, without deciding, that Attorney Barry's alleged ethical lapses would render

his prosecutorial acts "beyond [his] authority," Bernard, 356 F.3d at 504, the Court would still

find absolute prosecutorial immunity. That is because Plaintiff fails to support this broad attack

on Attorney Barry's ethics with plausible factual allegations. See, e.g., Pl.'s Sur-reply at 2

(failing to offer any factual allegations that would plausibly state an ethical violation under "the

Town of New Paltz Ethics Code at section 15-6" other than Plaintiff's own conclusory, legal assertions).

Given that Attorney Barry was acting within his authority when he engaged in the advocative acts of which Plaintiff complains, the Court finds that Attorney Barry is entitled to absolute prosecutorial immunity on all claims brought against him. Accordingly, the Court grants the Motion with respect to Attorney Barry.

### C.  Claims Against Neil Bettex

Next, the Court turns to the claims Plaintiff brings against Bettex. The New Paltz Defendants argue that the Court should dismiss any claims stated against him because the Complaint "provides no facts at all indicating what . . . Bettex did to allegedly violate the Plaintiff's constitutional rights." Defs.' Mem. at 19. "Indeed, the [Complaint] does not contain any specific allegations against Bettex . . . ." Id.

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under [Section] 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." Grullon v. City of New Haven, 720 F.3d 133, 138 (2d Cir. 2013) (emphasis in original); see also Whitton, 90 F. Supp. 2d at 427. Here, Plaintiff only ever mentions Bettex in the caption of his Complaint, Compl. at 1, and his list of Defendants, id. at 5. Even in Plaintiff's Response to the Motion and his Sur-reply, Plaintiff still fails to provide any new factual allegations against Bettex that might plausibly suggest his personal involvement with the complained-of violations. See Pl.'s Resp.; Pl.'s Sur-reply; see also Donhauser v. Goord, 314 F. Supp. 2d 119, 121 (N.D.N.Y. 2004) (considering "the factual allegations contained in [a pro se] plaintiff's . . . opposition papers" in resolving a motion to dismiss for failure to state a claim).

Given that Plaintiff has failed to provide any factual allegations concerning Bettex's personal conduct, the Court finds that Plaintiff has failed to state any cognizable Section 1983 claim against Bettex. Accordingly, the Court grants the Motion with respect to those claims.

### D.  Claims Against Stacy Delarede

The New Paltz Defendants similarly argue that the Court should dismiss any claims stated against Delarede because the Complaint "provides no facts at all indicating what Delarede . . . did to allegedly violate the Plaintiff's constitutional rights." Defs.' Mem. at 19. "[T]he only allegations of actions taken by Delarede . . . are that [she] conducted an inspection of one of . . . Plaintiff's properties" in April 2015. Id. at 19–20; see Compl. at 24–25. Elsewhere in the Motion, the New Paltz Defendants argue that any procedural or substantive "due process claim asserted by . . . Plaintiff is without merit[]" and "must be denied." Defs.' Mem. at 23–25.

In his Response to the Motion, Plaintiff clarifies that his "case is not premised on any of the events that transpired in 2015 and 2016 . . . ." Pl.'s Resp. at 1–2. "[T]his case is based and premised solely on the violations and events that transpired in 2018, 2019, and 2020." Id. at 2. Accordingly, the Court finds that Plaintiff has not stated any claims against Delarede for conduct regarding the April 2015 inspection. Even if Plaintiff had, he would run into the statute of limitations for Section 1983 actions arising in New York since he did not file this action until November 2021.[6] See Pinaud v. Cnty. of Suffolk, 52 F.3d 1139, 1156 (2d Cir. 1995); see also Veal v. Geraci, 23 F.3d 722, 724 (2d Cir. 1994) ("the claim accrues when the alleged conduct has caused the claimant harm and the claimant knows or has reason to know of the allegedly impermissible conduct and the resulting harm").

---

[6] Defendants raise a statute of limitations defense in their Motion. See Defs.' Mem. at 20–21.

However, Plaintiff does appear to make allegations against Delarede concerning her conduct in 2020 after his conviction. Specifically, Plaintiff alleges that in February 2020, the New Paltz Town Justice Court "ordered [Plaintiff's Properties] to undergo a series of special inspections by the building inspector, over the course of the next 12 months . . . ." Dkt. No. 39-1 at 16. According to Plaintiff, Delarede later "rescinded th[is] court order, presumably with the court's permission," after Plaintiff demonstrated to her that her demands conflicted with the requirements of "the New York State Fire Safety code . . . as well as the SUNY New Paltz fire safety policy . . . ." Id. (citing Dkt. No. 39-3 at 69–70). Plaintiff argues that the above events amount to a violation of his "due process" rights "because it was the duty and responsibility of [Delarede] to apprise the court of the contents of [the] New York State Fire safety code . . . as well as the fire safety housing policy of New Paltz University." Dkt. No. 39-1 at 17.

"[T]o state a valid substantive Due Process claim" pursuant to Section 1983, a plaintiff must sufficiently allege: (1) a 'valid property interest' or 'fundamental right'; and (2) that the defendant infringed on that right by conduct that 'shocks the conscience' or suggests a 'gross abuse of governmental authority.'" Leder v. American Traffic Solutions, Inc., 81 F. Supp. 3d 211, 223 (E.D.N.Y. 2015) (citations omitted). To state a valid procedural Due Process claim, on the other hand, a plaintiff must sufficiently allege: "(1) the existence of a property or liberty interest that was deprived; and (2) deprivation of that interest without due process." Bryant v. N.Y. State Educ. Dep't, 692 F.3d 202, 218 (2d Cir. 2012).

With respect to substantive Due Process, the Court finds that Plaintiff has failed to state a valid claim against Delarede for her conduct after his conviction. Delarede's conduct, as described by Plaintiff, does not "shock[] the conscience' or suggest[] a 'gross abuse of governmental authority.'" Leder, 81 F. Supp. 3d at 223 (citations omitted). By Plaintiff's own

telling, Delarede was responsive to his complaints and dropped her demands to implement certain changes that conflicted with fire safety codes that applied to Plaintiff. And given that Delarede allegedly reversed course after Plaintiff wrote a letter to her, Plaintiff fails to plausibly allege she infringed upon any "valid property interest" or "fundamental right" of Plaintiff.

The Court also finds that Plaintiff has failed to state a valid procedural Due Process claim against Delarede for her conduct after his conviction. Plaintiff suggests that there was something improper about Delarede's initial failure "to apprise the court of the contents of [the] New York State Fire safety code . . . as well as the fire safety housing policy of New Paltz University." Dkt. No. 39-1 at 17. But Plaintiff has failed to show how Delarede's initial failure—which Plaintiff claims she later corrected—deprived him of any particular property or liberty interest without sufficient process.

To the extent Plaintiff has stated any other claims against Delarede for the violations outlined in his Complaint, exhibits, and subsequent filings with the Court, those claims also fail to state a claim upon which relief may be granted because Plaintiff has failed to allege Delarede's "personal involvement in [any of those remaining] constitutional deprivation[s]." Grullon, 720 F.3d at 138. Accordingly, the Court grants the Motion with respect to the Section 1983 claims stated against Delarede.

### E.  Claims Against Mark Jaffee

The New Paltz Defendants also argue that the Court should dismiss any claims stated against Jaffee because the Complaint "provides no facts at all indicating what . . . Jaffee . . . did to allegedly violate the Plaintiff's constitutional rights." Defs.' Mem. at 19. "[T]he only allegations of actions taken by . . . Jaffee are that . . . [he] settled the 2016 violations with . . . Plaintiff . . . and testified as a witness for the Town at . . . Plaintiff's underlying trial." Id. at 19–

20 (citations omitted). Elsewhere in the Motion, the New Paltz Defendants argue that any claims against Jaffee "are barred by . . . Plaintiff's undisturbed conviction" and "the general rule set forth in Heck v. Humphrey[], 512 U.S. 477 [] (1994) . . . ." Defs.' Mem. at 14–15.

    As noted above, Plaintiff clarified in his Response to the Motion that his "case is not premised on any of the events that transpired in 2015 and 2016 . . . ." Pl.'s Resp. at 1–2. Therefore, the Court finds that Plaintiff has not stated any claims against Jaffee regarding his conduct in 2015 and 2016.

    Accordingly, the only acts of Jaffee that are relevant to the Court's analysis are Plaintiff's allegations that Jaffee (1) reported the violations in October 2018 that gave rise to Plaintiff's misdemeanor prosecution, and (2) testified at trial against Plaintiff. But any claims pertaining to the second set of allegations concerning Jaffee's testimony at trial are clearly precluded by the doctrine of absolute witness immunity. See Briscoe v. LaHue, 460 U.S. 325, 345–46 (1983) ("In short, the rationale of our prior absolute immunity cases governs the disposition of this case. In 1871, common-law immunity for witnesses was well settled. The principles set forth in Pierson v. Ray to protect judges and in Imbler v. Pachtman to protect prosecutors also apply to witnesses, who perform a somewhat different function in the trial process but whose participation in bringing the litigation to a just—or possibly unjust—conclusion is equally indispensable.").

    As for the claims related Jaffee's decision to initiate an enforcement action against Plaintiff by reporting the violations in October 2018, the Court must examine whether such claims "are barred by . . . Plaintiff's undisturbed conviction" and "the general rule set forth in Heck . . . ." Defs.' Mem. at 14–15. In Heck v. Humphrey, the Supreme Court held that:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has

been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983.

512 U.S. at 486–87 (footnote omitted). Therefore, the Court must inquire whether Plaintiff's claims against Jaffee concerning the enforcement action, if meritorious, "would render [the resulting] conviction or sentence invalid . . . ." Id.

To the extent Plaintiff has stated a claim for selective prosecution pursuant to the Equal Protection Clause against Jaffee, see, e.g., Compl. at 57–58 (describing how "municipal employees" routinely discriminate against "those who do business as off campus housing operators in the Town of New Paltz, but do not live in New Paltz"), the Court finds that Heck bars that claim. If Plaintiff were to succeed on that claim in this Section 1983 lawsuit, that success "would necessarily mean that his conviction was unlawful." Corley v. Vance, 365 F. Supp. 3d 407, 457 (S.D.N.Y. 2019) (finding that Heck bars a Section 1983 claim for selective prosecution); cf. Leather v. Eyck, 180 F.3d 420, 423–24 (2d Cir. 1999) (finding that Heck does not bar a § 1983 selective prosecution claim but only because the plaintiff in that case was "never in the custody of the State" and therefore had "no remedy in habeas corpus," unlike Plaintiff here, who was in the custody of New York).

As for whether Plaintiff has stated a "class of one" claim pursuant to the Equal Protection Clause against Jaffee for initiating the misdemeanor proceedings, see, e.g., Dkt. No. 39-1 at 26 (complaining that Jaffee allowed Plaintiff's neighbor "to operate as a multifamily when . . . that was not allowed in the zoning district"), the Court also finds that Heck bars that claim. If Plaintiff were to succeed on that claim in this Section 1983 lawsuit, that success would necessarily mean that Plaintiff's conviction was unlawful. See Chico Scrap Metal, Inc. v.

36

Raphael, 830 F. Supp. 2d 966, 970–72, 975 (E.D. Cal. 2011) (dismissing *all* of plaintiffs' Section 1983 claims relating to an investigation and prosecution that led to a conviction because of Heck, and in the alternative, dismissing plaintiffs' "class of one claim" on qualified immunity grounds); cf. Luck v. Westchester Med. Ctr., No. 17-CV-9110, 2020 WL 564635 (S.D.N.Y. Feb. 4, 2020), at *8, *15 (finding that a "class-of-one" equal protection claim pertaining to investigative acts leading up to plaintiff's conviction is not barred by Heck insofar as the plaintiff does "not pursue any damages arising from her conviction and incarceration in relation to [the] claim," unlike Plaintiff here).

To the extent that Plaintiff has stated any other claims against Jaffee for the violations outlined in Plaintiff's Complaint, exhibits, and subsequent filings with the Court, those claims also fail to state a claim upon which relief may be granted because Plaintiff has failed to allege Jaffee's "personal involvement in [any of those remaining] constitutional deprivation[s]." Grullon, 720 F.3d at 138. Accordingly, the Court grants the Motion with respect to the Section 1983 claims stated against Jaffee.

### F. Claims Against the Town of New Paltz

Given that Plaintiff fails to state a claim upon which relief may be granted against any of the individuals employed by the Town of New Paltz, the New Paltz Defendants argue that Plaintiff's claims against the Town of New Paltz itself must be dismissed as well. Defs.' Mem. at 27–29 (citing Bennett v. Dutchess County, 832 Fed. App'x 58, 61 (2d Cir. 2020) ("And without an underlying constitutional violation, [the plaintiff's] Monell claim . . . likewise fails.")) (other citations omitted); see also Monell v. Dep't of Soc. Servs. Of City of New York, 436 U.S. 658, 694 (1978) ("We conclude . . . that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's

policy or custom, whether made by its lawmakers or by those whose edits or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."). While this argument succeeds with respect to many of the claims Plaintiff states against the Town of New Paltz, see, e.g., Dkt. No. 39-1 at 17 (Plaintiff stating that "the Town of New Paltz" is liable for Delarede's alleged failure "to apprise the court of the contents of" certain fire safety codes), this argument does not succeed with all of them.

That is because Plaintiff does not seek to hold the Town of New Paltz "liable *solely* because it employs [several] tortfeasor[s] . . . ." Monell, 436 U.S. at 692. Plaintiff also seeks to hold the Town of New Paltz liable for its policies and customs—namely, the zoning regulations in its Town Code and the way the Town of New Paltz enforces them against Plaintiff. In his Complaint and first exhibit, Plaintiff facially attacks the Town Code on preemption grounds, arguing that it requires property owners to violate the rights of certain protected groups under the NYSHRL and federal housing policies. Dkt. No. 39-1 at 21–22. Plaintiff also attacks the Code as applied to him, contending that there is a custom of discriminatory enforcement against him and similarly situated individuals, Compl. at 57–58, 73–74, and that the Code, when applied to him, amounted to a taking of his property without just compensation, id. at 73–74.

Plaintiff's preemption and discriminatory enforcement claims, however, are barred by Heck, 512 U.S. 477. A successful showing that the Town of New Paltz regulations giving rise to Plaintiff's misdemeanor conviction are preempted by superior state and federal law would necessarily impugn the validity of Plaintiff's undisturbed conviction. See also Morris v. U.S.C. Service Title 18 Section 2251(A), No. 19-CV-2377, 2020 WL 5995769, at *2 (N.D. Tex. Aug. 3, 2020) (finding that Heck barred a claim that the state law giving rise to plaintiff's state

conviction was "preempted by federal law").[7] Likewise, a successful showing that the Town of New Paltz enforced these regulations in a discriminatory manner against Plaintiff would also necessarily impugn the validity of his conviction. See Corley, 365 F. Supp. 3d at 457; Chico, 830 F. Supp. 2d at 970–72.

As for Plaintiff's Section 1983 Takings Clause claim, which seeks compensation for the Town Code's negative economic effect on the value of his Properties, the New Paltz Defendants ask this Court to dismiss it on the basis that Plaintiff has failed to adequately plead the elements of a categorical or non-categorical takings claim. See Defs.' Mem. at 25–27.

"The Supreme Court has identified two distinct strains of regulatory-takings analysis." Cmty. Hous. Improvement Program v. City of New York, 492 F. Supp. 3d 33, 45 (E.D.N.Y. 2020), aff'd, 59 F.4th 540 (2d Cir. 2023), aff'd sub nom. 74 Pinehurst LLC v. New York, 59 F.4th 557 (2d Cir. 2023). "The first applies in the case of a regulation that 'denies all economically beneficial or productive use of land.'" Id. (citations omitted). That analysis, however, does not apply here, because Plaintiff fails to allege that he has "been deprived of all economically viable use of" his two Properties by the Town of New Paltz. Id. (footnote omitted).

"Even without rendering property worthless, a regulatory scheme may still effectuate a taking if it 'goes too far,' in Justice Holmes's words." Id. at 46 (quoting Pa. Coal Co. v. Mahon, 260 U.S. 393, 415 (1922)). "In the current era, courts apply the three-factor test of Penn Central to determine whether a regulation that works a less-than-total destruction of value has gone too far." Cmty. Hous. Improvement Program, 492 F. Supp. at 46. The three factors are: (1) "[t]he

---

[7] Even if Heck did not bar the preemption claim, Plaintiff would still likely fail to state a claim because "[a] violation of the Supremacy Clause is distinct from, and does not necessarily give rise to, a violation of federal rights actionable under § 1983." Wachovia Bank, N.A. v. Burke, 414 F.3d 305, 321 (2d Cir. 2005).

economic impact of the regulation on the claimant," (2) "the extent to which the regulation has

interfered with distinct investment-backed expectations," and (3) "the character of the

governmental action." Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 124 (1978).

With respect to economic impact, "mere diminution in the value of property, however serious, is

insufficient to demonstrate a taking." Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers

Pension Tr., 508 U.S. 602, 645 (1993). As for investment-backed expectations, the purpose of

that factor "is to limit recovery to owners who could demonstrate that they bought their property

in reliance on a state of affairs that did not include the challenged regulatory regime." Allen v.

Cuomo, 100 F.3d 253, 262 (2d Cir. 1996). Finally, regarding the "character" of the taking, "[a]

taking may more readily be found when the interference with property can be characterized as a

physical invasion by government, than when interference arises from some public program

adjusting the benefits and burdens of economic life to promote the common good." Penn Cent.,

438 U.S. at 124.

Here, Plaintiff alleges that he has lost some potential rental income because he cannot

rent the Properties to more than five unrelated persons, but as the New Paltz Defendants point

out, that economic impact "is hardly sufficient to establish a taking." Defs.' Mem. at 26.[8] And

while Plaintiff alleges that he bought the Properties in 2012 and 2013, he fails to provide any

allegation that he purchased these properties "in reliance on a state of affairs that did not include

the challenged regulatory regime." Allen, 100 F.3d at 262. Because Plaintiff cannot prevail on a

---

[8] Plaintiff also claims that the fines imposed pursuant to his conviction "amount to a taking of property without compensation," Dkt. No. 39-1 at 13, but that sort of Takings Clause claim is better construed as an Excessive Fines claim, and is barred by Heck, 512 U.S. 477. See Mondragon v. Sena, No. 18-CV-0430, 2020 WL 954178, at *7 (D.N.M. Feb. 27, 2020) (finding that an award of "damages on the basis that the state court imposed 'excessive fines or bail[]' . . . would necessarily undermine the conviction in violation of the Heck v. Humphrey doctrine").

regulatory takings claim without plausibly alleging the first two <u>Penn Central</u> factors, <u>see</u> <u>Lingle</u> <u>v. Chevron U.S.A. Inc.</u>, 544 U.S. 528, 540 (2005), Plaintiff fails to adequately plead a Section 1983 Takings Clause claim against the Town of New Paltz.

Given the above, the Court grants the Motion with respect to the Section 1983 claims brought against the Town of New Paltz.

### G. Executive Order Claims

Plaintiff also asserts that the New Paltz Defendants violated President Biden's July 9, 2021, Executive Order. They move to dismiss these claims on the ground that "an Executive Order may not be enforced by a private party where no private right of action is created." Defs.' Mem. at 29 (quoting <u>Chen v. Slattery</u>, 862 F. Supp. 814, 822 (E.D.N.Y. 1994)).

"It is well-established that no private right of action exists to enforce obligations imposed on executive branch officials by executive orders." <u>Calef ex re. Calef v. Barnhart</u>, 309 F. Supp. 2d 425, 433 (E.D.N.Y. 2004) (citing <u>Zhang v. Slattery</u>, 55 F.3d 732, 747 (2d Cir. 1995)). "[A]n executive order is privately enforceable only if it is issued pursuant to a statutory mandate or delegation of congressional authority." <u>Calef</u>, 309 F. Supp. 2d at 433 (citing <u>Chen Zhou Chai v. Carroll</u>, 48 F.3d 1331, 1336 (4th Cir. 1995)).

Here, the July 9, 2021, Executive Order states: "This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or *any other person*." Exec. Order No. 14036 § 6(d), 86 Fed. Reg. 36,987, 36,999 (2021) (emphasis added). Therefore, Plaintiff has no right to sue the New Paltz Defendants under the Executive Order. Accordingly, the Court grants the Motion with respect to the Executive Order claims asserted against the New Paltz Defendants.

### H.  Remaining State Law Claims

Plaintiff also brings claims under the New York State Human Rights Law ("NYSHRL"), id. at 10, and the law of fraud in New York, Dkt. No. 39-1 at 33. However, since the Court has dismissed all of Plaintiff's federal claims asserted against the New Paltz Defendants, the Court declines to exercise supplemental jurisdiction over state-law claims asserted against the New Paltz Defendants. See 28 U.S.C. § 1367(c); see also Valencia ex rel. Franco v. Lee, 316 F.3d 299 (2d Cir. 2003). Accordingly, the Court grants the Motion with respect to the remaining state-law claims asserted against the New Paltz Defendants.

### V.    CONCLUSION

In conclusion, it is hereby:

**ORDERED**, that the New Paltz Defendants' Motion (Dkt. No. 56) is **GRANTED**; and it is further

**ORDERED**, that Plaintiff's claims against James Bacon, Kevin Barry, Neil Bettex, Stacy Delarede, Mark Jaffee, and the Town of New Paltz, are **DISMISSED**; and it is further

**ORDERED**, that the Clerk of the Court **TERMINATE** the following defendants from the docket of this case: James Bacon, Kevin Barry, Neil Bettex, Stacy Delarede, Mark Jaffee, and the Town of New Paltz; and it is further

**ORDERED**, that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all the parties, in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:    March 14, 2023
                Albany, New York

LAWRENCE E. KAHN
United States District Judge